NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13850


COMMONWEALTH  vs.  JAVAINE WATSON.



Suffolk.     April 8, 2026. - July 9, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges,
Dewar, & Wolohojian, JJ.


Homicide.  Cellular Telephone.  Evidence, Scientific test,
    Identification, Presumptions and burden of proof.
    Practice, Criminal, Postconviction relief, Presumptions and
    burden of proof.  Evidence, Relevancy and materiality.
    Practice, Criminal, Discovery.  Statute, Construction.
    Identification.  Words, "Evidence."



Indictment found and returned in the Superior Court
Department on March 14, 2014.

Following review by this court, 487 Mass. 156 (2021),
postconviction motions for scientific or forensic analysis,
filed on May 1 and December 4, 2023, were heard by Michael J.
Pineault, J.

A request for leave to appeal was allowed by Kafker, J., in
the Supreme Judicial Court for the county of Suffolk.


Darcy Jordan, Assistant District Attorney (Ian Polumbaum,
Assistant District Attorney, also present) for the Commonwealth.
Merritt Schnipper for the defendant.
M. Chris Fabricant, of New York, Claudia Leis Bolgen, Kevin
S. Prussia, James M. Lyons, Kerry G. Matlack, Radha Natarajan,
Katharine Naples-Mitchell, & Suma V. Nair, for Massachusetts

Association of Criminal Defense Lawyers & others, amici curiae, submitted a brief.

WENDLANDT, J. General Laws c. 278A, inserted by St. 2012, c. 38, "An Act providing access to forensic and scientific analysis" (act), establishes a process, "separate from the trial and any subsequent proceedings challenging an underlying conviction, that permits forensic and scientific analysis of evidence or biological material, the results of which could support a motion for a new trial." Commonwealth v. Clark, 472 Mass. 120, 121-122 (2015). Because the Legislature intended "to remedy the injustice of wrongful convictions," Commonwealth v. Wade, 467 Mass. 496, 504 (2014) (Wade II), S.C., 475 Mass. 54 (2016) (Wade III), the act makes "postconviction forensic testing easier and faster than it had been for defendants who sought such testing in conjunction with motions for new trials pursuant to Mass. R. Crim. P. 30, as appearing in 435 Mass. 1501 (2001)," Commonwealth v. Moffat, 478 Mass. 292, 301 (2017). Accordingly, discovery under the act is governed by the requirements set forth therein rather than by the standards for a motion for a new trial under rule 30.

The Commonwealth contends that the defendant, Javine Watson, was not entitled to discovery under the act because it narrowly permits scientific testing of "physical" evidence for biological material and the defendant requested digital forensic

analysis of a codefendant's cell phones.  We disagree.  Although enacted "in the wake of a national recognition that [deoxyribonucleic acid (DNA)] testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty" (quotation and citation omitted), Wade II, 467 Mass. at 497, the act is not limited to scientific testing for biological material.  Instead, the act broadly permits a party to seek "forensic or scientific analysis" of "evidence or biological material," G. L. c. 278A, §§ 3, 7; the act defines "analysis" as a "process by which a forensic or scientific technique is applied to evidence or biological material."  G. L. c. 278A, § 1.

Consistent with this broad, remedial mandate, we have recognized that the act permits postconviction testing of biological material for DNA evidence, as well as other forensic testing of clothing, shell casings, and ballistics for evidence other than DNA.  See, e.g., Commonwealth v. Jenks, 487 Mass. 1032, 1034-1036 (2021) (reversing denial of G. L. c. 278A motion for testing of ballistics evidence for weights and diameters of projectiles, land and grove impressions, and rifling system direction); Commonwealth v. Williams, 481 Mass. 799, 803, 809 (2019) (reversing denial of G. L. c. 278A motion "requesting that clothing recovered from the victim be tested for traces of gunshot residue and that shell casings recovered at the crime

scene be tested for fingerprints"); Wade II, 467 Mass. at 497, 515 (reversing denial of G. L. c. 278A motion for DNA testing of seminal fluid).

Concluding that the act permits digital forensic analysis of a cell phone, and further concluding that the Superior Court judge did not err in determining that the defendant showed by a preponderance of the evidence that a reasonably effective attorney would have sought the requested discovery and that the anticipated analysis has the potential to unearth evidence that is material to the defendant's identification as the perpetrator of the crime in the underlying case, we affirm the judge's allowance of the defendant's G. L. c. 278A motions.[1]

1.  Background.  We present the relevant factual background from the trial record, reserving certain details for later discussion.[2]

---

[1] We acknowledge the amicus brief submitted by the Massachusetts Association of Criminal Defense Lawyers, the New England Innocence Project, the Criminal Justice Institute at Harvard Law School, the Innocence Project, the Innocence Network, and the Boston Bar Association.

[2] The defendant was tried jointly alongside three codefendants -- Omar Bonner, Omar Denton, and Andrew Robertson. The evidence presented at trial is summarized in more detail in our decisions affirming the convictions of murder in the first degree for the defendant, Bonner, and Robertson.  See Commonwealth v. Bonner, 489 Mass. 268, 269-275 (2022); Commonwealth v. Robertson, 489 Mass. 226, 227-229, cert. denied, 143 S. Ct. 498 (2022); Commonwealth v. Watson, 487 Mass. 156, 157-161 (2021).

In December 2013, the victim, Romeo McCubbin, was shot and killed while sitting in his car after attending an event at a nearby nightclub.  The murder was captured by a surveillance camera mounted to the exterior of a residence near the nightclub; the surveillance video footage, in conjunction with photographs from the nightclub event, placed the defendant's codefendants -- Omar Bonner, Andrew Robertson, and Omar Denton -- at the scene of the crime.

The footage showed a man, inferably Robertson, firing a handgun about ten times into the front driver's side window of the victim's car before fleeing the scene in a getaway vehicle -- a red Lincoln MKX, which the prosecution asserted the defendant was driving.[3]  The victim subsequently climbed over to the passenger's side seat and rolled out of the passenger door onto the sidewalk.

Roughly forty seconds after the first shooting, a second person, inferably Denton, walked toward the victim and shot him four times.  A third person, inferably Bonner, accompanied Denton and kicked the victim before leaving the scene.

About an hour after the murder, police officers discovered the Lincoln, unoccupied and with the engine running, near where two of the codefendants were arrested.  Inside were keys to the

_____

[3] The video footage did not reveal the face of the driver of the Lincoln.

defendant's own car and to the back door of his home and a cell phone with a number ending in 6426 (6426 number), which was registered to the defendant's stepmother but used by the defendant. Fingerprint analysis revealed the presence of the defendant's and his codefendants' fingerprints throughout the Lincoln. The defendant's fingerprints were found on the vehicle's gearshift, outside driver's side door handle, inside driver's side door handle, and front and rear passenger's side doors.

Digital forensic analysis of the defendant's 6426 number showed the codefendants' contact information and numerous communications between the defendant's cell phone and the codefendants' cell phones in the month preceding the murder, including multiple calls on the days before and on the night of the shooting. Listed in the defendant's cell phone was the contact information for a phone number ending in 8764 (8764 number), which was registered to Robertson's former girlfriend.[4]

Digital forensic analysis of the 8764 number revealed that in the month preceding the murder, the 8764 number had 203 contacts with the defendant's 6426 number and 312 contacts with the cell phone of a key witness -- Nadira Amoroso; the

---

[4] Robertson's former girlfriend testified at trial that she canceled service for the 8764 number in December 2013, the same month as the murder, at Robertson's request.

prosecution relied on Amoroso's testimony to show the defendant's participation in the planning of the murder.

Specifically, Amoroso testified that she had been dating the defendant at the time of the murder; that, prior to the murder, the defendant had asked to borrow the Lincoln, which she had rented; that she had seen the defendant at the nightclub near the site of the shooting on the night of the murder;[5] that the morning after the murder, the defendant told her that he had abandoned the vehicle in an unknown driveway, fearing that he was being followed; and that during her relationship with the defendant she contacted him on both the 6426 number and the 8764 number registered to Robertson's former girlfriend. At trial, defense counsel maintained that Amoroso was in a relationship with Robertson and that her testimony, including her assertion that she had loaned the Lincoln to the defendant, was fabricated to protect Robertson. To support this theory, counsel focused on Amoroso's assertion that during her relationship with the defendant she contacted him on the 8764 number registered to Robertson's former girlfriend; specifically, counsel highlighted

---

[5] At trial, Amoroso testified that she did not remember seeing the defendant at the nightclub near the scene of the murder and had mistakenly told the grand jury that she had witnessed him there; however, her grand jury testimony was admitted substantively at trial. See Commonwealth v. Daye, 393 Mass. 55, 73 (1984), overruled in part on other grounds by Commonwealth v. Cong Duc Le, 444 Mass. 431, 435-439 (2005).

that digital forensic analysis of the 8764 and 6426 numbers revealed that in the month preceding the murder, there were approximately 312 contacts between Amoroso's cell phone and the 8764 number registered to Robertson's former girlfriend, but only one contact between Amoroso's cell phone and the defendant's 6426 number.

When confronted with this extensive call history with the 8764 number, Amoroso dismissed counsel's suggestion that she was speaking with Robertson rather than the defendant, testifying that she did not know Robertson at all and could not identify him in the court room. In closing, the prosecution also combatted the defendant's theory that the 8764 number belonged to Robertson, suggesting that the defendant and Robertson may have been "changing up" their cell phones and highlighting Amoroso's testimony, including her assertion that she contacted the defendant on the 8764 number and that the defendant had two cell phones. The jury convicted the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. The defendant moved for judgment notwithstanding the verdict on the grounds that "Amoroso perjured herself and that the government was well aware of that," as she "had no relationship with [the defendant] whatsoever." The trial judge denied the motion. In April 2021,

we affirmed the defendant's conviction.[6]  See Commonwealth v.

Watson, 487 Mass. 156, 170 (2021).

2.  G. L. c. 278A motions.  In May 2023, the defendant

filed a motion pursuant to G. L. c. 278A, § 3, for forensic

analysis of three cell phones that police officers had seized

from Robertson following an unrelated incident in February 2014,

approximately two months after the victim's shooting.  The

defendant had sought access to these same cell phones pretrial,

but his motions were denied,[7] and the defendant did not appeal

from the trial judge's rulings.

In December 2023, the defendant filed a second motion

pursuant to G. L. c. 278A, § 3, seeking forensic analysis of two

additional cell phones that police officers had seized from

Robertson in connection with another unrelated crime, which

occurred in July 2013, approximately five months before the

---

[6] The jury also convicted the defendant of being an
accessory after the fact, which we vacated on direct appeal.
Watson, 487 Mass. at 170.

[7] In his pretrial motions, the defendant argued that the
records from Robertson's three cell phones could reveal
contacts, calls, and text messages showing that Amoroso and
Robertson were in a relationship, arguably refuting Amoroso's
grand jury testimony that she was in a relationship with the
defendant and bolstering his defense that Amoroso provided false
testimony about the defendant's involvement in the planning of
the shooting in an attempt to protect Robertson.  After a
nonevidentiary hearing, the trial judge denied the defendant's
motions on the grounds that the cell phones were seized during
an unrelated investigation with no nexus to the victim's
killing.

victim's shooting. Trial counsel had not sought access to these two additional cell phones even though he knew that they were available prior to trial. As the defendant had done in connection with his pretrial motions for access to Robertson's cell phones, see note 7, supra, the defendant asserted in his c. 278A motions that digital forensic analysis of the now five cell phones could yield evidence that Amoroso committed perjury to protect Robertson, who the defendant alleged was her boyfriend at the time of the murder.[8]

In April 2024, the motion judge, who was not the trial judge, concluded that the defendant had met the threshold showing required under G. L. c. 278A, § 3 (b), and scheduled an evidentiary hearing to determine whether the defendant's request also satisfied the requirements of G. L. c. 278A, § 7. In its opposition, the Commonwealth argued that the phrase "forensic or

---

[8] In support of his argument that the requested analysis was reasonably likely to produce evidence that Amoroso provided false testimony about contacting the defendant on the 8764 number registered to Robertson's former girlfriend, the defendant noted that in the month preceding the murder, the 8764 number not only had 312 contacts with Amoroso's number and 203 contacts with the defendant's 6426 number, but also 73, 276, and 224 respective contacts with three numbers belonging to women known to have dated Robertson. The defendant argued that, "[a]s a simple matter of physics," it would have been impossible for him to use the 8764 number to contact Amoroso roughly ten times per day during the month preceding the murder while Robertson also used it to communicate with his three girlfriends nearly twenty times per day and with the defendant six times per day over the same period.

scientific analysis," as used in the act, means the application of "natural and physical sciences" to (1) "evidence in the case that has already been tested" but should be retested "due to advancements in scientific testing," or (2) "already collected evidence that reasonably contains material suitable for [scientific] testing."  The Commonwealth contended that the defendant's motions did not involve forensic analysis as "no scientific principles" needed to "be applied to obtain the [cell phones] or their records, or to identify, interpret, evaluate, or understand the contents of those records."  The Commonwealth also contended that the defendant's request did not involve "evidence" within the meaning of the act, as the defendant was not seeking analysis of previously tested or already collected evidence, but rather was seeking "the production of tangible items ([cell phones]), and the production of documentary evidence associated with those tangible items ([cell phone] records)" (emphases in original); put differently, the Commonwealth argued that the defendant was "asking for a means to collect -- not analyze or test -- data from the phones."

At the evidentiary hearing, the sole witness was the defendant's digital forensics expert.  The expert testified that digital forensic analysis of a cell phone is a multistep process involving proper seizure of the physical device, overcoming password protection to decrypt cell phone content, and

extracting and memorializing data from the device and any media storage devices.  The expert focused on digital forensic techniques that can access password-protected cell phones through "brute force" methodology and that can extract a wide array of digital content, including user-deleted content, call logs, text message logs, global positioning system (GPS) coordinates, and encrypted data from user applications.  The expert noted that errors in the application of the forensic techniques can cause loss of data; he testified that an analyst should try to extract data from the cell phone as soon as the device is powered on, as a device can start overwriting older data once it is active.

Following the expert's testimony, in its posthearing memorandum, the Commonwealth conceded that "digital forensic analysis ([the defendant's expert's] field) is a type of forensic science" and that "digital forensics involves scientific expertise."  Nonetheless, relying on Commonwealth v. Cronin, 495 Mass. 170, 178-181 (2025), the Commonwealth argued that the cell phone data extraction sought by the defendant "falls outside the 'forensic analysis' contemplated by c. 278A" because an extraction report "can be generated by a layperson with basic training and read by anyone."

In May 2025, the judge allowed the defendant's motions for forensic analysis of the five cell phones, concluding, inter

alia, that digital forensics falls within the scope of "analysis" as defined in G. L. c. 278A, § 1, and that the defendant had otherwise satisfied the requirements of G. L. c. 278A, §§ 3 and 7.  The Commonwealth appealed,[9] and in November 2025, a single justice of this court allowed the Commonwealth's petition under the gatekeeper provision of G. L. c. 278, § 33E.

3.  Discussion.  a.  Standards of review.  "We review a question of statutory interpretation de novo."  Wade III, 475 Mass. at 60.  Because the motion judge was not the trial judge, we also review de novo his rulings that the defendant satisfied G. L. c. 278A, §§ 3 and 7, to the extent that the rulings were based purely on the documentary record, see Wade II, 467 Mass. at 506; we defer to the judge's findings of fact based on the defendant's expert's testimony unless they are clearly erroneous, see Commonwealth v. Cadet, 473 Mass. 173, 179 (2015) ("A reviewing court accepts the motion judge's findings of fact, made after an evidentiary hearing, if they are supported by the record, and defers to the judge's assessments of credibility . . . ." [citation omitted]).

---

[9] Robertson opposed the defendant's G. L. c. 278A motions, arguing, inter alia, that the defendant was not entitled to analyze the five seized cell phones because he still had a privacy interest in them.  The motion judge rejected Robertson's arguments.  Robertson did not appeal from the judge's order or otherwise participate in the present appeal.

b.  Scope of permissible "analysis."  On appeal, the
Commonwealth does not press precisely the same arguments it
marshalled before the motion judge.  Instead, it principally
contends that the term "analysis" as used in the act is limited
to "laboratory testing" of what it describes as "physical
evidence," which it further asserts is limited to "tangible
evidence capable of being handled, preserved, consumed,
degraded, or destroyed" during testing.  At oral argument, the
Commonwealth further clarified its position, contending that
G. L. c. 278A is limited to "physical, tangible evidence that's
capable of being tested for biological material," such as a
"bloody sock" onto which a biological specimen has been
deposited.[10]

---

[10] "Ordinarily, the failure to raise a legal argument at the
trial level results in its waiver."  Luppold v. Hanlon, 495
Mass. 148, 165-166 (2025).  However, because here the
Commonwealth's principal argument on appeal is essentially an
extension of its earlier assertions that the sought discovery
does not fall within the act, as it does not involve application
of "natural and physical sciences" to "analyze or test" the
sought evidence, and because the issue presented is purely a
legal one of statutory construction, we reach the merits.  See
Commonwealth v. Powell, 468 Mass. 272, 275 n.5 (2014) ("The
Commonwealth's over-all challenge to the . . . rule is
essentially an extension of its assertion that the . . . rule is
limited in scope. . . .  We therefore do not consider the
argument waived").  Cf. LaChance v. Commonwealth, 437 Mass.
1013, 1014 (2002) (declining to reach issues raised for first
time on appeal where record was "lacking . . . in providing a
basis for their intelligent resolution" [citation omitted]).

Consideration of the Commonwealth's arguments requires us to determine whether digital forensic analysis of a cell phone involves "analysis" as defined under the act.  "[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished" (citation omitted).  Matter of the Estate of Mason, 493 Mass. 148, 151 (2023).  We begin "our analysis . . . with the principal source of insight into legislative intent -- the plain language of the statute."  Gravito v. Commonwealth, 496 Mass. 756, 759 (2025), quoting Patel v. 7-Eleven, Inc., 489 Mass. 356, 362 (2022), S.C., 494 Mass. 562 (2024).  "If the statutory language is clear and unambiguous, it is conclusive as to legislative intent" (quotation omitted).  Gravito, supra, quoting Patel, supra.

In construing the plain language, "we must strive to give effect to each word . . . so that no part will be inoperative or superfluous" (citation omitted).  Commonwealth v. Fleury, 489 Mass. 421, 427 (2022).  And "[i]f the words used are not otherwise defined . . . , we afford them their plain and ordinary meaning."  Matter of E.C., 479 Mass. 113, 118 (2018).

Here, the Legislature defined the term "analysis" as "the process by which a forensic or scientific technique is applied

to evidence or biological material to identify the perpetrator of a crime." G. L. c. 278A, § 1. The Legislature did not define the terms "forensic or scientific technique" or "evidence." Accordingly, we turn to consider whether digital forensic analysis of a cell phone involves application of a "forensic or scientific technique" to "evidence," applying the terms' plain and ordinary meanings consistent with legislative intent.

i. Forensic or scientific technique. We need not dwell long on the question whether digital extraction of data on the sought cell phones, as described by the defendant's expert, involves the application of a "forensic or scientific technique" because the Commonwealth conceded that "digital forensic analysis" of the type contemplated by the defendant's expert is a type of "forensic science" involving "scientific expertise." The Commonwealth presses the argument that, despite its concession, our decision in Cronin, 495 Mass. at 178-181, compels a contrary conclusion. We disagree.

In Cronin, 495 Mass. at 178-179, we concluded that a lay witness, such as a police officer trained in the proper use of a digital forensics tool, can testify to the steps he or she personally performed to obtain an extraction report using the tool. We did not consider the act, much less the question whether cell phone extraction involves application of forensic

or scientific techniques. Indeed, we cautioned that such a lay witness could not attest to the tool's reliability and accuracy. Id. at 180. This is because such testimony requires expertise about the underlying forensic and scientific techniques embedded in the tool that permit retrieval of digital data from the cell phone. Id. Our careful delineation between a lay witness trained to use the tool, on the one hand, and an expert in digital forensics with specialized knowledge as to the reliability and accuracy of the forensic and scientific techniques in the tool, on the other hand, does not support the Commonwealth's claim. Accordingly, we conclude, consistent with the defendant's expert's testimony, that digital extraction of cell phone data involves application of a forensic or scientific technique.[11]

ii. Evidence. We next consider the Commonwealth's principal argument on appeal -- that the requested digital

---

[11] To the extent the Commonwealth contends that forensic or scientific techniques are limited to "laboratory testing," the claim is entirely undeveloped and does not rise to the level of appellate argument. See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019). Further, limiting the act's permissible "forensic or scientific technique[s]" to those that occur in a "laboratory," a term undefined by the Commonwealth, finds no basis in the words of the act or the act's broad remedial purposes. See Commonwealth v. Ramos, 490 Mass. 818, 824 (2022) ("As a broad interpretation of c. 278A aligns with the remedial nature of the statute, we generally have construed the language of [the act] . . . in a manner that is generous to the moving party" [quotation, citation, and alteration omitted]).

forensic analysis does not involve "evidence" as that term is used in the act.  The Legislature did not define the term "evidence," and thus we are guided by its plain and ordinary meaning.  See Matter of E.C., 479 Mass. at 118.  Specifically, evidence ordinarily includes objects "that tend[] to prove or disprove the existence of an alleged fact."[12]  Black's Law Dictionary 696 (12th ed. 2024).  See Black's Law Dictionary 635 (9th ed. 2009) (same); Merriam-Webster's Collegiate Dictionary 565 (12th ed. 2026) (defining evidence as "something [as testimony, a writing, or an object] submitted at a judicial or administrative proceeding for the purpose of proving a party's case"); American Heritage Dictionary of the English Language 616 (5th ed. 2018) (defining evidence as "[a] thing or set of things helpful in forming a conclusion or judgment").

The sought cell phones and their digital contents, which include, inter alia, call logs, text message logs, location information, and information from cell phone applications, fall comfortably within the scope of "evidence."  See, e.g., Commonwealth v. Carleton, 497 Mass. 11, 27-28 (2026) (considering as evidence photographs retrieved using digital

---

[12] Notably, the act does not apply to all evidence; the "evidence" must be of a type as to which a forensic or scientific technique may be applied.  See G. L. c. 278A, § 1. The sought discovery must also meet the other requirements of the act.  See, e.g., G. L. c. 278A, §§ 3, 7.

forensic software that "locate[d] the code necessary to unlock the cell phone" and then "read the files extracted from the cell phone"); Cronin, 495 Mass. at 175 ("Commonwealth . . . entered in evidence fifteen images that [a police officer] had extracted from the defendant's cell phone" using digital forensics tool [emphasis added]); Commonwealth v. Woollam, 478 Mass. 493, 498-499 (2017), cert. denied, 584 U.S. 944 (2018) (upholding admissibility of evidence, including "cell phone records, . . . records of call metadata, text messages, and a summary chart" [footnote omitted]).  In fact, the Commonwealth introduced cell phones and cell phone data extraction reports as evidence in connection with the defendant's underlying conviction.

The Commonwealth's argument that the "structure" of G. L. c. 278A "presupposes" that "evidence" consists of "tangible evidence capable of being handled, preserved, consumed, degraded, or destroyed" by testing and thus (according to the Commonwealth[13]) does not encompass a cell phone or its digital

---

[13] It is not apparent that the Commonwealth's assertions are grounded in any scientific principles.  The defendant's expert testified that digital forensics involves "handling" the physical, tangible cell phones, as well as any attached physical, tangible media storage devices, like subscriber identity module (SIM) cards and secure digital (SD) cards, and "preserving" the content that is extracted from those physical, tangible devices.  The expert also testified that preservation of the data required proper application of techniques and that improper handling of the physical devices could result in overwriting, modification, or destruction of data.  The Commonwealth leaves unexplained the scientific basis for its

contents, as well as its further contention that "evidence" is limited to items containing biological specimens, ignores that the act uses the term "evidence" without the additional features fashioned to it by the Commonwealth.  See Wade III, 475 Mass. at 63 ("We do not read into the [act] a provision which the Legislature did not see fit to put there, nor add words that the Legislature had the option to, but chose not to include" [citation omitted]).

Nor does the Commonwealth's construction of "evidence" find support in G. L. c. 278A, § 8.  Section 8 sets forth the standards for conducting analysis of "evidence or biological material," including protocols for, inter alia, protecting the integrity of the tested item, using accredited forensic services providers, and preserving the tested item for replicate analysis, where possible.  None of these standards demonstrates that the defendant's requested digital forensic analysis falls outside the act's permitted analysis.  Indeed, G. L. c. 278A, § 8, like the other sections of the act, uses the term

---

position that DNA extracted from a physical item, such as a bloody sock, is any more "physical" than the data extracted from a cell phone.  Cf. 1 M.R. Arkfeld, Electronic Discovery and Evidence § 2.5(F) (2025) (listing types of data stored on cell phones and external media storage devices, including call logs, pictures, and GPS location data); Withers, Electronically Stored Information:  The December 2006 Amendments to the Federal Rules of Civil Procedure, 4 Nw. J. Tech. & Intell. Prop. 171, 174 (2006) ("electronically stored information is replicated on media in various physical locations").

"evidence" without affixing the limitations posited by the Commonwealth.

To the extent the Commonwealth's position is that the act is limited to testing for DNA or similar biological evidence, we disagree. The act contemplates the application of forensic or scientific techniques to "evidence or biological material" (emphasis added). G. L. c. 278A, § 1. The disjunctive "or" indicates that "evidence" is not "biological material," which the act separately defines as "a sexual assault forensic examination kit, semen, blood, saliva, hair, skin tissue or other identified biological substance." Id. See Wade III, 475 Mass. at 61 ("The word 'or' is given a disjunctive meaning unless the context and the main purpose of all the words demand otherwise" [citation omitted]). Reading "evidence" as limited to items that can be tested for biological specimens would render the defined term "biological material" largely superfluous. See Fleury, 489 Mass. at 427. It would also run counter to our decisions allowing postconviction testing of other types of nonbiological material. See, e.g., Jenks, 487 Mass. at 1034-1036 (testing of ballistics evidence for weight, dimensions, and rifling system direction); Williams, 481 Mass. at 803, 809 (testing of gunshot residue on clothing and fingerprints on shell cases).

The Commonwealth's reliance on the act's legislative history is misplaced.  To begin, ordinarily where "the words of the statute are unambiguous, we need not consult its legislative history."  Garcia v. Steele, 492 Mass. 322, 328 n.7 (2023).  The Legislature deliberately chose to permit forensic analysis of "evidence or biological material."  G. L. c. 278A. §§ 3, 7.

Notably, the Commonwealth was the forty-ninth State to enact legislation allowing for postconviction testing.  See Wade II, 467 Mass. at 509 & n.15.  In determining to permit postconviction analysis using forensic or scientific techniques applied to "evidence" or "biological materials," the Legislature chose to enact a broader remedial scheme rather than adopt the more limited enactments from other States, which expressly limited postconviction discovery to DNA testing of biological material.[14]  See id. at 509 (noting that Massachusetts, as forty-ninth State to enact postconviction testing law, "set[] a far

_____

[14] See, e.g., Cal. Penal Code § 1405(a) ("A person who was convicted of a felony and is currently serving a term of imprisonment may make a written motion . . . for performance of forensic [DNA] testing"); Colo. Rev. Stat. § 18-1-412(1) ("An eligible person may apply at any time to the district court in the district where the conviction was secured for DNA testing concerning the conviction and sentence"); N.C. Gen. Stat. § 15A-269(a) ("A defendant may make a motion before the trial court that entered the judgment of conviction against the defendant for performance of DNA testing . . .").

lower bar for access to scientific testing than that required by similar statutes in other States").

The Commonwealth posits that if digital forensic analysis of cell phones is permitted by the act, "every few weeks, [a] defendant would meet the requirements of G. L. c. 278A and the cell phones could arguably be re-extracted in perpetuity" because digital forensic technologies may be updated periodically.  The concern is overstated.  As we have concluded previously, to re-analyze evidence using an updated forensic or scientific technique, the moving party must show "a material improvement over any previously conducted analysis in accurately identifying or excluding the [moving] party as the perpetrator of the crime."  Commonwealth v. Donald, 468 Mass. 37, 44 (2014), S.C., 487 Mass. 1036 (2021).  The moving party seeking to re-analyze the same evidence must also satisfy all the other requirements of G. L. c. 278A.[15]  See id. at 47-48 (affirming

---

[15] For example, a party seeking digital forensic analysis must show, as discussed infra, that the requested analysis has the potential to result in evidence that is material to the moving party's identification as the perpetrator of the crime in the underlying case.  G. L. c. 278A, § 7 (b) (4).  See, e.g., Moffat, 478 Mass. at 300-301 (G. L. c. 278A motion for DNA testing of four cigarette butts found on public road in vicinity of crime scene properly denied where testing did not have potential to reveal evidence material to identifying perpetrator of crime given there was nothing to indicate when cigarette butts might have been deposited and no witness mentioned cigarette smoking).

denial of G. L. c. 278A motion where defendant could show requested re-analysis using new method offered "material improvement," but failed to satisfy G. L. c. 278A, § 3 [b] [5]).

c. <u>Allowance of motion</u>. i. <u>Reasonably effective counsel</u>. The Commonwealth next maintains that the defendant is not entitled to the requested analysis because he did not satisfy G. L. c. 278A, § 7 (<u>b</u>) (3), which required that the defendant show by a preponderance of the evidence "that the evidence or biological material [the defendant seeks to analyze] has not been subjected to the requested analysis for any of the reasons" enumerated in G. L. c. 278A, § 3 (<u>b</u>) (5).[16] The motion judge

---

[16] The five reasons enumerated in G. L. c. 278A, § 3 (<u>b</u>) (5), for not having previously conducted the requested analysis are as follows:

"(i) the requested analysis had not yet been developed at the time of the conviction;

"(ii) the results of the requested analysis were not admissible in the courts of the commonwealth at the time of the conviction;

"(iii) the moving party and the moving party's attorney were not aware of and did not have reason to be aware of the existence of the evidence or biological material at the time of the underlying case and conviction;

"(iv) the moving party's attorney in the underlying case was aware at the time of the conviction of the existence of the evidence or biological material, the results of the requested analysis were admissible as evidence in courts of the commonwealth, a reasonably effective attorney would have sought the analysis and either the moving party's attorney failed to seek the analysis or the judge denied the request; or

determined that the defendant had satisfied G. L. c. 278A, § 3 (b) (5) (iv),[17] because a "reasonably effective attorney would have sought the analysis" of Robertson's five cell phones, trial counsel "failed to seek the analysis" for two of the cell phones, and trial counsel did seek the now-requested analysis for three of the cell phones, but "the judge denied the request."  G. L. c. 278A, § 3 (b) (5) (iv).

The Commonwealth does not contest the motion judge's findings, which are amply supported by the record.  The defendant's principal defense at trial was that Amoroso, who provided key testimony linking the defendant to planning the shooting, provided false testimony against the defendant to protect Robertson, with whom she was in a relationship. Examining the five cell phones, which were known to belong to Robertson in the months immediately before and immediately after the murder, to uncover information connecting Amoroso and Robertson and thus potentially undermine Amoroso's testimony that she did not know (or even recognize) Robertson, falls

---

"(v) the evidence or biological material was otherwise unavailable at the time of the conviction."

[17] The motion judge also found that the defendant satisfied G. L. c. 278A, § 3 (b) (5) (i).  Because a defendant need only show that the requested analysis was not previously performed because of one of the five enumerated reasons set forth in 3 (b) (5), we need not review the judge's conclusion as to that prong.  See Wade III, 475 Mass. at 61.

squarely within a strategy that a reasonably effective trial counsel would have employed.  See Wade II, 467 Mass. at 511 (G. L. c. 278A, § 3 [b] [5] [iv], does not "import[] the standard of ineffective assistance of counsel"; defendant need only show that "'a' reasonably effective attorney would have sought the requested analysis, not that every reasonably effective attorney would have done so" [emphases in original]).  See also Commonwealth v. Ramos, 490 Mass. 818, 828 (2022) ("a reasonably effective attorney would have requested the DNA testing in light of the fact that it potentially could corroborate the testimony of the lone defense witness and contradict the Commonwealth's argument").

Instead, the Commonwealth argues that the motion judge erred because G. L. c. 278A, § 3 (b) (5) (iv), should be read to apply only when the defendant's earlier motion for the same analysis was denied on the grounds that the results were inadmissible in the courts of the Commonwealth at the time.  The argument confuses G. L. c. 278A, § 3 (b) (5) (iv), with G. L. c. 278A, § 3 (b) (5) (ii), which expressly provides as an independent basis for relief that "the results of the requested analysis were not admissible in the courts of the commonwealth at the time of the conviction."  We are not at liberty to add this limitation, which is absent from prong (iv) and which would render superfluous the separate basis for relief under prong

(ii).  See <u>Tze-kit Mui</u> v. <u>Massachusetts Port Auth</u>., 478 Mass. 710, 712 (2018) ("ordinarily we will not add language to a statute where the Legislature itself has not done so").  See also A. Scalia & B.A. Garner, Reading Law:  The Interpretation of Legal Texts 174 (2012) ("If possible, every word and every provision is to be given effect . . . .  None should be ignored.  None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence").[18]

ii.  <u>Analysis material to identification</u>.  The Commonwealth further maintains that the motion judge erred in concluding that the defendant satisfied G. L. c. 278A, § 7 (<u>b</u>) (4), which required the defendant to show by a preponderance of the evidence that the requested forensic analysis "has the potential to result in evidence that is material to the [defendant's] identification as the perpetrator of the crime in the underlying case."  Evidence is "material" within the meaning of G. L. c. 278A, § 7 (<u>b</u>) (4), when it "is of significance to the moving party's identification as the perpetrator of the crime"; this includes evidence that "would tend to support" the defendant's

---

[18] The Commonwealth's additional argument that the defendant waived his right to analyze the five cell phones pursuant to G. L. c. 278A because he failed to appeal from the denial of his pretrial motion for access to three of the cell phones is contrary to the express language of the act.  See G. L. c. 278A, § 15 ("The right to file a motion under this chapter shall not be waived").

theory of defense and "challenge the Commonwealth's account of the sequence of events." Ramos, 490 Mass. at 825, 827-828.

Here, records show hundreds of calls between the 8764 number -- the cell phone number registered to Robertson's former girlfriend, which Robertson had canceled following the murder and which plausibly was being used by Robertson -- and at least three women with whom Robertson had a relationship. Trial counsel relied on these records to mount the defendant's principal defense -- that Amoroso, the only witness to testify that the defendant knowingly participated in an advanced plan to kill the victim by borrowing the Lincoln, fabricated her testimony to protect Robertson. The requested discovery, which may reveal contacts between Robertson and Amoroso on his other cell phones in the months preceding and following the murder, thus has the potential to uncover communications between Robertson and Amoroso, see Clark, 472 Mass. at 135-136 ("Legislature's use of the word 'potential' in § 7 [b] [4] suggests an awareness of the fact that the requested forensic analysis may not produce the desired evidence, but such a consequence should not be an impediment to analysis in the first instance"), and those potential communications would bolster the defendant's defense by showing that Amoroso committed perjury in stating that she did not know Robertson and could not identify him; evidence of her perjury would in turn cast doubt on her

testimony as a whole -- testimony the prosecution relied on in advancing its theory that the defendant was an active participant in the planning of the murder. Indeed, in closing, the prosecution emphasized Amoroso's testimony to argue that the defendant was "the driver of that [Lincoln] MKX," including her assertion that she contacted the defendant on the 8764 number, that the defendant had two cell phones, and that he borrowed the Lincoln from her prior to the murder.

Thus, contrary to the Commonwealth's contentions, the requested analysis would not provide "mere" impeachment evidence. Evidence that Amoroso and the defendant did not in fact have numerous telephone calls together would "challenge the Commonwealth's account of the sequence of events" -- namely, that the defendant was a full participant in the advanced planning of the murder, including by asking Amoroso if he could borrow the Lincoln, which the Commonwealth alleged the defendant used to bring Robertson to the location of the shooting and then assist Robertson in fleeing the scene. Ramos, 490 Mass. at 828. See Watson, 487 Mass. at 162 ("For murder in the first degree both under the theory of deliberate premeditation and under the theory of extreme atrocity or cruelty, to prove the defendant guilty as a joint venturer, the Commonwealth had to prove beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, and that the defendant had

or shared the required criminal intent" [quotations and citation omitted; emphasis added]).

The Commonwealth claims that the discovery of communications between Amoroso and Robertson would not be "material" to identifying the defendant as required by the act because other evidence implicated him in the joint venture -- specifically, the presence of his fingerprints and personal belongings in the Lincoln, and the call logs showing numerous contacts between him and his codefendants in the month leading up to the murder and on the night of the murder.  That other evidence may pose a challenge for the defendant to successfully move for a new trial, see Commonwealth v. Gaines, 494 Mass. 525, 539 (2024), but it does not govern his ability to access discovery under the act, which was intended to "provide increased and expeditious access to scientific or forensic testing," "the results of which subsequently might support a motion for a new trial," Wade II, 467 Mass. at 505, 509.  See Ramos, 490 Mass. at 824 ("we have emphasized that defendants need not demonstrate that the requested testing could result in evidence that would justify a new trial"); Commonwealth v. Linton, 483 Mass. 227, 242 (2019) ("The requirements of G. L. c. 278A are, by design, less stringent than a motion for a new trial pursuant to Mass. R. Crim. P. 30").  See also Commonwealth v. Steadman, 489 Mass. 372, 389 (2022) ("moving party need only

show that the required analysis <u>could</u> be material to the question of . . . identity, and not whether it <u>would</u> have had any effect on the underlying conviction" [emphases in original; quotations and citation omitted]); <u>Clark</u>, 472 Mass. at 136 (evidence may be material under act even in "the presence of overwhelming evidence of guilt in the underlying trial" [citation omitted]).[19]

4. <u>Conclusion</u>.  For the foregoing reasons, we affirm the allowance of the defendant's motions for postconviction forensic analysis under G. L. c. 278A.

<u>So ordered</u>.

---

[19] Construing the act to permit the discovery requested here does not impermissibly "allow[] the defendant to bypass the limits of [Mass. R. Crim. P. 30]," as the Commonwealth contends. "In enacting G. L. c. 278A, the Legislature <u>separated</u> the procedure for seeking forensic testing from the procedure for seeking scientific testing in conjunction with a motion for a new trial pursuant to Mass. R. Crim. P. 30 (b), and intended that G. L. c. 278A provide <u>increased and expeditious access</u> to scientific or forensic testing" (emphases added).  <u>Wade II</u>, 467 Mass. at 509.  Should the sought discovery prove fruitful, the defendant will need to meet the requirements of rule 30 to obtain a new trial.